Filed 5/28/13  P. v. Liu CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B239667 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA090637) |
| v. | |
| JEN CHI LIU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Bruce F. Marrs, Judge.  Affirmed.

Law Offices of Nolan F. King, Nolan F. King and Nicola Fitzgerald for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Daniel D. Chang and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Jen Chi Liu appeals from the judgment entered following successive jury trials in which he was convicted of reckless driving and assault with a deadly weapon on a peace officer. Defendant contends the trial court erred by admitting a video he recorded, denying his motion for a new trial, and denying his suppression motion. We affirm.

## BACKGROUND

The issues raised on appeal pertain to defendant's second trial. Accordingly, we summarize only the evidence from that trial.

About 9:00 p.m. on May 13, 2010, California Highway Patrol (CHP) Officer Gary Talaugon was on patrol in the Diamond Bar vicinity when he saw a car traveling westbound in the carpool lane on the 60 Freeway at a very high speed. (Unspecified date references pertain to May 13, 2010.) Talaugon "paced" the car and determined its speed was 100 miles per hour. The car's speed then increased. Talaugon turned on his car's overhead red and blue flashing lights, but the driver of the speeding car (subsequently identified as defendant) did not respond. Talaugon focused his car's spotlight on the side mirrors of defendant's car, then on the car's back window. With the aid of the spotlight, Talaugon could see that defendant was alone in the car. He also saw defendant's eyes as defendant looked in his rearview mirror. Talaugon turned on his car's siren and used his car's public address (PA) system to tell defendant to pull to the right shoulder.

Defendant moved from the carpool lane to lane No. 1, and Talaugon followed. Talaugon then moved to lane No. 2 to "take" the lane to keep other cars out of the way, but defendant moved back into the carpool lane. Talaugon moved back into the carpool lane behind defendant. Defendant again moved right one lane, but when Talaugon followed and moved into lane No. 2, defendant returned to the carpool lane. Talaugon got back behind defendant in the carpool lane. Defendant again moved right, slowed a little, moved into lane No. 2, then began moving right again into lane No. 3. Suddenly, defendant veered left and slammed on his brakes. Talaugon testified that he could see the road ahead of defendant's car, and there were no vehicles ahead of defendant when

2

defendant slammed on the brakes. Talaugon, who was three or four car-lengths behind defendant and driving at about 50 to 60 miles per hour, was unable to stop his car in time, and it crashed into the back of defendant's car. Defendant's car "veered sharply to the left" and struck the center divider. Talaugon drove his car to the right shoulder. Talaugon testified that the entire incident, from his first observation of defendant's speeding car until the collision, was three to five minutes, and he had been following defendant with his red and blue overhead lights flashing for two to three minutes before the collision.

Talaugon denied that he attempted a "PIT maneuver" against defendant and testified that such a maneuver is performed from alongside, not behind, the target vehicle, requires authorization by a sergeant, and can only be used against vehicles going 35 miles per hour or less. Talaugon estimated defendant was driving at 55 to 60 miles per hour at the time he slammed on the brakes. Talaugon further testified that he was unable to change lanes safely when defendant slammed on his brakes because vehicles were rapidly approaching from behind in the lanes to his left and right.

Off-duty Los Angeles County Sheriff's Deputy Kevin Martin was driving westbound on the 60 Freeway in the No. 1 lane about 9:00 p.m. when he saw a car pass him at high speed in the carpool lane. Soon thereafter, a CHP car passed Martin in the carpool lane and the CHP officer turned on his car's overhead red and blue flashing lights. Martin testified he saw the pursued car move from the carpool lane to the No. 1 and No. 2 lanes, then it went "a little back and forth between the 1 and 2 for a few feet." Suddenly, the driver of the pursued car slammed on his brakes, even though there appeared to be nothing in front of it or any reason to stop. The CHP car struck the back of the pursued car, which spun out of control into the carpool lane. Martin stopped his car on the right shoulder and went to assist the CHP officer.

Wayne Langford was also driving westbound on the 60 Freeway about 9:00 p.m. He saw emergency lights approaching from far behind him and began moving to the right to yield. He saw the emergency vehicle and a car it was apparently pursuing change

3

lanes several times. The pursued car moved between the No. 1 lane and the No. 3 lanes several times and did not appear to be yielding to the emergency vehicle. The pursued car and a CHP car passed Langford, who was driving 65 to 70 miles per hour. Langford saw the pursued car move in front of the CHP car, then slam on the brakes. There were no cars ahead or to the right or left of the pursued car when its driver slammed on the brakes. The CHP car crashed into the pursued car. Langford thought he was also going to crash because there were cars behind him that were approaching "extremely fast," but he managed to change lanes, then stop on the shoulder to offer help to the CHP officer.

Los Angeles County Fire Department firefighter and paramedic Nick Galaz testified that he responded to the collision on the 60 Freeway. Galaz could hear defendant yelling, using profanity, and threatening to sue someone from all the way across the freeway. Defendant told Galaz he took cholesterol medication and was diabetic, but did not take any diabetes medication. Galaz testified that defendant exhibited no symptoms of diabetic shock. Defendant complained of back and neck pain and said he had a prior back injury. The paramedics assessed defendant's condition and Galaz testified that defendant's wrists, hands, feet, and "everything" were "working properly." Galaz saw defendant shove his right foot under one of the car's pedals. Defendant then claimed his foot was stuck.

Galaz testified that although defendant was initially cooperative, he became extremely agitated and abusive when Galaz and other paramedics attempted to place a "C collar" on him. Defendant complained that the collar was too tight, cursed at Galaz, and threatened to sue him. When the paramedics began moving defendant from a backboard to a gurney, defendant became more combative. Defendant began "swinging his wrists around, grabbing at our straps to remove them, and grabbing at our hands as we were trying to restrain him."

CHP Officer Andrew Carneal responded to the scene of the collision and was the investigating officer. He testified that when he arrived, defendant was seated in the driver's seat of his car, which was against the center divider, blocking the carpool lane

and facing oncoming traffic. Defendant was holding a video camera in his hands and apparently recording a video. Defendant appeared to be extremely agitated and angry. He was verbally abusive to Carneal, other officers, and paramedics. Although Carneal saw defendant moving his arms, hands, feet, neck, and body while he was in the car, defendant said his left wrist was "broken" when Carneal asked for defendant's identification. Defendant told Carneal he had been "pitted." Carneal heard one of the firefighters say, "Don't hit me." The firefighter was restraining one of defendant's arms, and defendant was reaching toward the firefighter's face with his other arm. Carneal handcuffed defendant and advised him he was under arrest.

Defendant stopped talking and complaining when he was put into the ambulance, even though the C-collar was still in place. Carneal followed the ambulance to the hospital emergency room and remained there for about five hours until defendant was released for booking. Defendant did not complain while he was at the hospital, even though the C-collar was still in place. Numerous tests were performed on defendant, but he was not admitted. Carneal was told that defendant had an elevated heart rate, but his blood sugar was within normal limits, and testing showed defendant had no drugs or alcohol in his system. No casts were placed on any part of defendant's body. Carneal could not remember the exact words of the emergency room physician, but the physician essentially told Carneal that defendant was not injured or that nothing was wrong with defendant and it was "okay to book" defendant. The physician did not tell Carneal to bring defendant back for follow-up care or give Carneal any instructions regarding further treatment for defendant.

When defendant was removed from his car, he left his video camera. Carneal had "someone" retrieve it and give it to him. (The last few frames of the video show a firefighter moving the camera, then the recording ends.) The camera remained in Carneal's possession until he returned to the Santa Fe Springs CHP station. Carneal looked at the contents of the camera. Two of numerous videos "stood out," and Carneal watched "[j]ust a little bit of" the videos "to see that it was from the scene" of the

5

incident. Carneal booked the camera into evidence. He did not make copies of the videos. If someone, such as the prosecutor, wanted a copy, she would have to go through a formal process with the station's evidence officer. Carneal subsequently watched the video in the prosecutor's office, and it was "the same video that [he] had watched that was on the tape that was taken from [defendant's] camera."

The prosecutor played one of the video recordings during Carneal's testimony, and Carneal testified that it accurately depicted "the scene that [Carneal] saw that night on the 60 freeway" and "defendant's attitude" toward responding officers and firefighters. The video, filmed from inside defendant's car, shows traffic slowly passing defendant's car and numerous emergency vehicles arriving on the freeway. A CHP officer asked defendant if he was "alright," and defendant said he was not and needed medical assistance. A different CHP officer, apparently Talaugon, approached defendant with another officer. Talaugon asked defendant why he slammed on his brakes. Defendant said, "I was trying to get over. I didn't know. You were yelling something on something I couldn't hear. My radio wasn't even on." Talaugon replied, "Sir I was behind you for two miles with my lights on." Defendant said, "No." Talaugon continued, "And you can't slam on your brakes okay?" Defendant responded, "No, no that's not what happened." A third CHP officer asked defendant to step out of his car. Defendant said his ankles were "messed up" and "stuck on the brake," and he would "need help getting out." The officer asked if defendant had his "information" with him. Defendant said, "Yes. How about getting me some medical assistance first?" The officer told defendant medical assistance was on the way. A little later, another CHP officer approached defendant and asked how he was doing. Defendant said, "Not good." The officer told defendant he did not "want to be on camera," asked defendant about his injuries, and told defendant that "the fire department" was on its way.

The video later showed Carneal arriving. He greeted defendant and said, "We need to get your car over to the shoulder." Defendant responded, "No shit." Carneal asked, "Why are you talking to me like that?" Defendant replied, "Because you guys left

6

me like this fucking thing like this. You know endanger my fucking life—I need medical attention. Where the fuck's the paramedics?" Carneal said they were stuck in traffic and asked defendant to get out of his car. Defendant said he needed assistance getting out and added, "I told that fucking officer that five times." Carneal asked why defendant needed assistance to get out, and defendant replied, "Because I'm fucking hurt take a guess." Carneal asked what hurt, and defendant replied, "Everything my fucking neck, back, ankles." Carneal directed another officer to start defendant on oxygen and "put him in a collar." The other officer asked defendant what hurt, and defendant began referring to his "disabled placard," saying, "See that, see that, see that?"

Carneal subsequently asked defendant what happened. Defendant replied, "That idiot rear ended me, he fucking PIT maneuvered me." Carneal asked, "Why? Were you not stopping for his lights?" Defendant replied, "Yes I was stopping. I turned my turn signals on." Carneal asked, "How far back did you see his lights come on?" Defendant responded, "I don't know, maybe a little—" Carneal asked, "Like a long way back?" Defendant said, "No, no. I hope he has a fucking camera in his cruiser because then we'll see." Carneal asked to see defendant's identification, and defendant responded, "No. Just give me my medical attention, when the hell are you going to give me my medical attention." Carneal repeatedly asked defendant for his identification, then asked defendant where it was. Defendant said it was in his pocket. Carneal asked defendant to retrieve it. Defendant said he could not because his wrist was injured. Carneal noted that defendant had been using his phone and his wrist was "working fine." Defendant responded, "You idiot, it's my left wrist." Carneal stated, "[Y]our left wrist has been working fine. You've been shining your camera at me the whole time." (Earlier in the video, defendant gestured with his left arm, wrist, and hand as he spoke to a CHP officer.) Carneal continued to ask defendant for his driver's license. Defendant then said he needed "help to get out of my vehicle to get my wallet." On two occasions when Carneal asked defendant where he was injured and what happened, defendant said he had

7

previously told Carneal or other officers and said, "Its [*sic*] on tape," and asked, "Do you want to rewind the tape. We'll rewind the tape. You can subpoena it."

The video depicted a firefighter or paramedic, apparently Galaz, arriving and speaking to defendant at his car. Defendant was initially cooperative, but when the paramedics put a "C collar" on defendant, he complained it hurt and choked him. The paramedics loosened the collar and adjusted its position. One of the paramedics or firefighters explained, "We are going to take care of you." Defendant retorted, "No you are trying to save the city from being sued. That's what you are trying to do." As the paramedics or firefighters attempted to get defendant out of his car, he yelled, "Ow, shit." One of the firefighters said, "You need to chill right now." Defendant responded, "Yeah, you know what I need to get a fucking pension plan like you guys."

Defendant testified that he was driving from his home in Chino to a post office in the City of Industry when the collision occurred. A few weeks earlier, he had noticed a "momentary" stalling or acceleration problem with his car. He had been driving at 85 to 90 miles per hour on the 71 Freeway, then got on the westbound 60 Freeway. Due to the problem with his car, he thought it would be safer to drive in the carpool lane, even though he was alone. Defendant was not certain he would make it to the next exit. There was no traffic, and he saw the CHP car behind him when he entered the carpool lane. He was going about 65 miles per hour, but increased his speed when the CHP car got behind him. He did not know it was a CHP car. The CHP car was tailgating defendant's car, so defendant moved out of the carpool lane. About 20 seconds later, the driver of the CHP car turned on a single red light, but he never turned on the siren. Defendant knew he had to pull over. The officer turned on his spotlight, which blinded defendant. Defendant also heard the PA system, but could not discern what the officer said. He assumed the officer was saying to pull over. He had previously been pulled over by the CHP.

Defendant testified that he moved all the way to the No. 4 lane with the CHP car following him. A car cut in front of defendant and he braked hard and was hit by the CHP vehicle. Defendant could not change lanes because there was a car to his right and

8

possibly on his left. He added that he did not want to move to the left because then it would appear he was not pulling over. Defendant denied trying to cause injury or property damage. He was going about 50 miles per hour when the collision occurred. Defendant's car spun out of control and ended up between the No. 2 and No. 3 lanes, facing oncoming traffic. He drove his car to the center divider for safety.

Defendant testified that although he was calm enough to drive to the center divider, he was "hysterical" after the accident. He feared the firefighters and police officers because he had just been in an accident with a police officer, Talaugon was trying to get him to admit something, and he feared the officers were going to beat him. Defendant used profanity to relieve his stress, like tennis players who "'grunt.'" He saw Carneal talking to the firefighters before they approached him and he was concerned about what they were going to do. He thought the firefighters were becoming angry and mocking him. One of the firefighters grabbed defendant by the throat, and three firefighters "threw" him from the driver's seat onto the gurney and immediately handcuffed him.

Defendant testified that the firefighters removed the neck brace they had put on him while he was still in his car and no one put it back on him. The emergency room physician prescribed glucophage for defendant's diabetes and told him to follow up with his personal physician.

During her cross-examination of defendant, the prosecutor played a second portion of the video, which continued where the first portion previously played left off. Firefighters repeatedly asked defendant to relax and told him they needed to keep "it" on him due to his complaints of neck and back pain. Defendant swore at the firefighters and called them names. One firefighter then said, "You're not going to take swings at us." Defendant denied "taking swings at" them. A firefighter warned defendant that he would be "restrained if you are taking swings," then said, "He's taking swings at us." One of the officers or firefighters repeatedly asked to see defendant's wallet, and he repeatedly

9

refused.  Carneal then told defendant he had to handcuff defendant because he was swinging at people.

Defendant admitted he had a prior petty theft conviction.

In defendant's original trial, the jury convicted him of reckless driving in violation of Vehicle Code section 23103, subdivision (a), acquitted him of battery on a firefighter, and could not reach verdicts on charges of assault with a deadly weapon on a peace officer and evading an officer with willful disregard, in violation of Vehicle Code section 2800.2, subdivision (a).  The court declared a mistrial as to the latter charges.

Before defendant's second trial, the prosecution declared it was unable to proceed on the evading charge, which the trial court dismissed in the interest of justice.  The jury convicted defendant of assault with a deadly weapon on a peace officer in violation of Penal Code section 245, subdivision (c).  (Undesignated statutory references are to the Penal Code.)  Defendant filed a motion for a new trial, which the trial court denied, as discussed later in this opinion.  The court sentenced defendant to four years in prison, with a 90-day concurrent term for reckless driving.

## DISCUSSION

### 1.    Admission of video

On September 13, 2011, the day before defendant's first trial, defendant filed a motion in limine seeking to exclude all of the video recordings on the ground they were irrelevant to the charges, constituted improper character evidence, and should be excluded pursuant to Evidence Code section 352.  The prosecutor told the court, "I had previously stated to counsel that I was going to introduce the video.  At this point, it is unlikely that I will do so."  After the prosecutor described the origin and nature of the video, the court said it appeared to be admissible, but the court would not address the issue at that time.  Defense counsel told the court, "Our issue is, first and foremost, how the officers came into possession of this evidence.  To begin with, I believe that it's a Fourth Amendment issue."  The prosecutor did not introduce the video.

10

Before the retrial, defendant retained new attorneys.  On the second day of trial, defendant filed a motion in limine seeking to exclude all of the video recordings from defendant's camera.  The motion cited section 1538.5, subdivisions (a) and (h), and argued that defendant had just learned that the prosecutor intended to introduce the video recordings.  It argued that the seizure of the video recorder violated the Fourth Amendment and that "there is a clear 'Chain of Evidence' issue as to the recorder."

The trial court considered the motion in limine the next morning.  Defense counsel argued as follows:  "Your Honor, we're talking about the recorder that the D.A. is planning to use to show videos from.  And it's not part of—it wasn't in the police report at all.  It was found in [defendant's] car when they did a search of the car, I guess for inventory purposes.  And there was no warrant to retrieve the recorder and use it—and actually—sorry—look at the recordings.  [¶]  It's not part of the crime.  And there was no consent from [defendant], either, to take the recorder.  [¶]  The main point here is there's a clear chain of evidence issue as to the recorder.  We have no idea who took it, when it was taken, there's no custody trail, and we don't even know where it is at this point in time.  We have no idea if there was tampering of the recorder."  Counsel also argued that a recording made "in a Verizon store" "five months earlier" was irrelevant.

The prosecutor told the court that Talaugon and Carneal would both testify that they saw defendant holding a video camera and apparently recording with it, that the officers asked defendant to put down the recorder and he refused, and that defendant even referred to checking the video.  Defendant left the camera in the car when he was moved to the ambulance, and the video showed either a firefighter or CHP officer retrieving the camera from the car.  The prosecutor further told the court that defendant's voice was clearly heard on the video recording and "you see the 60 freeway, you see his car is facing the wrong way in what appears to be the HOV lane, and then you see his full interaction with the police officers and with the firefighters.  I think that evidence is relevant."

The trial court ruled as follows: "As I understand the offer of proof by the People, the defendant is observed by police personnel holding this cell phone or camera. Pointing it at the policemen, apparently recording. And the statement check the video to see what happened at some point in time. The defendant was asked a couple times to put the camera down. The policemen would be reasonable in having a belief that the footage would show the circumstances of any detention as well as questions or answers and the manner that the defendant responded, if he responded at all. And it would seem that the contents of the tape would be relevant. [¶] Most individual human being types are able to identify themselves in a picture or a tape or identify their voices. And oftentimes they can identify other voices from unseen people. Therefore the policemen would be able to authenticate the location, and the time that the tape was being made."

Upon inquiry by the court, the prosecutor represented that Carneal told her that the video camera was in his possession from the time he left the scene until he booked it into evidence. The prosecutor stated she did not have a booking slip for the camera. The court agreed with defendant's request that the prosecutor be precluded from mentioning the video "until they can establish a chain of custody through this officer."

Later the same day, the prosecutor informed the court that she had provided defendant with a copy of the "evidence property report receipt, showing that a yellow and gray video recorder . . . was entered into evidence by an officer A. Carneal" in this case.

The court informed the parties that it had noticed that in the police report attached to defendant's motion for discovery pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) the video recorder was listed as an item booked into evidence in this case.

Outside of the presence of the jury before Carneal testified or the prosecutor played the recording, defendant stated, "Excuse me. The chain of evidence hearing should be done outside the presence of the jury, should it not?" The court responded, "Unless you've got something up your sleeve, the chain of evidence seems to be satisfied by the fact that it got booked into evidence on or about the date of the events when it was

12

recovered." Defendant explained, "Also they copied it. There's people that handled it between the time they got it and today. They provided us with a copy of it. It's been handled by numerous people." The court ruled, "Motion for a formal 402 hearing on that ground will be denied. It does appear there's sufficient basis, particularly if the officer testifies when he first viewed it that's the way it looked and it looks the same today."

Defendant contends that the trial court erred by denying his suppression motion, failing to require chain of custody evidence to be given in a hearing outside of the presence of the jury, and admitting the video, which he argues was irrelevant and should have been excluded pursuant to Evidence Code section 352 as unduly prejudicial.

### a. In limine suppression motion

"The time limits for bringing a motion to suppress for a felony offense are found in Penal Code section 1538.5, subdivisions (h) and (i). Those sections provide, '(h) If, prior to the trial of a felony or misdemeanor, opportunity for this motion did not exist or the defendant was not aware of the grounds for the motion, the defendant shall have the right to make this motion during the course of trial. [¶] (i) If the property or evidence obtained relates to a felony offense initiated by complaint and the defendant was held to answer at the preliminary hearing, or if the property or evidence relates to a felony offense initiated by indictment, the defendant shall have the right to renew or make the motion at a special hearing relating to the validity of the search or seizure which shall be heard prior to trial and at least 10 court days after notice to the people, unless the people are willing to waive a portion of this time.'" (*People v. Frazier* (2005) 128 Cal.App.4th 807, 828 (*Frazier*).)

The suppression motion defendant contends the trial court improperly denied was made on the second day of his second trial. Defendant's motion argued, "Defendant learned of the People's intention to use and show the jury the recordings made on the Defendant's personal recorder on December 13, 2011." This conclusory assertion ignores the pertinent history of the case and fails to demonstrate either that the "opportunity for this motion did not exist or the defendant was not aware of the grounds

13

for the motion" earlier in the proceedings. The ground for the motion was the asserted Fourth Amendment violation, of which defendant was aware prior to his first trial. Indeed, counsel for defendant acknowledged at the preliminary hearing that he had received a disk containing videos and, as noted by the trial court, the CHP's arrest and investigation report attached to defendant's *Pitchess* motion, which was filed July 27, 2011, about six weeks before the first trial began, listed as one of four items booked into evidence a "Hand held video recording device used by Liu at the scene." Carneal's narrative summary in that report also referred to defendant "using his small video recording device to record me." Also, as previously noted, the prosecutor had told defense counsel prior to the first trial that she had intended to introduce video recordings from the seized camera, but then changed her mind. Thus, even if defendant was previously unaware that the CHP had seized his video recorder, he necessarily knew it sometime prior to the first trial. He nonetheless waited another three months to file his suppression motion. He also failed to provide the prosecution with 10 days' notice and nothing in the record indicates the prosecutor waived any portion of this time. Although defendant substituted counsel shortly before the start of the second trial, section 1538.5, subdivision (h) does not authorize a late motion based on a change of representation or defense strategy. "Further, . . . allowing the knowledge of the defense to be assessed based on the knowledge of new counsel alone will encourage gamesmanship in the use of substituted counsel and the delay of trials." (*Frazier*, *supra*, 128 Cal.App.4th at p. 829.) Accordingly, defendant's motion was untimely and made on insufficient notice, and the trial court could have summarily denied it on those grounds.

With respect to the merits, the trial court did not err. A lawful custodial arrest supports a search of a vehicle occupied or recently occupied by the arrestee "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" (*Arizona v. Gant* (2009) 556 U.S. 332, 343 [129 S.Ct. 1710].) Where such a search is permissible, officers may "search not just the passenger compartment but every purse, briefcase, or other container within that space." (*Id.* at p. 345.) Here, several CHP

14

officers, including Carneal, saw defendant using the video camera while they were dealing with him and defendant referred to matters being captured on his "tape." It was reasonable for Carneal to believe that the video camera might contain audio and video recordings that would themselves be evidence relevant to one or more of the crimes for which defendant was arrested and taken into custody, which, as shown by the CHP's arrest report, included battery on a firefighter and assault with a deadly weapon on a peace officer. Carneal reasonably could have believed that defendant's camera captured both the battery upon the firefighter and defendant's hostility toward the CHP officers and firefighters, and that this hostility would be relevant to show that defendant braked severely with the intent to cause the pursuing CHP officer to collide with his car. Accordingly, Carneal permissibly seized or directed the seizure of the video camera. Although defendant challenged only the seizure of the camera, and not the viewing of its contents, we note that a warrantless "search" of the camera by viewing the videos—even if that occurred at a later time—was permissible because the camera was a "container" within defendant's car that could be searched incident to his lawful custodial arrest. (*People v. Diaz* (2011) 51 Cal.4th 84, 88, 98–101 [delayed warrantless search of text messages on phone seized from arrestee's person was valid as search incident to lawful custodial arrest]; *People v. Nottoli* (2011) 199 Cal.App.4th 531, 555–557 [warrantless search of smart phone found in arrestee's car was valid as search incident to lawful custodial arrest].)

b.    **Failure to require proof of chain of custody outside of jury's presence**

We review any ruling on the admissibility of evidence for abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*), disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

The trial court was not required to have testimony establishing the chain of custody given in a hearing outside the presence of the jury. Evidence Code section 402, subdivision (b) permits admissibility determinations to be made outside the presence of the jury, but requires this procedure only when a trial court "determine[s] the question of

15

the admissibility of a confession or admission of the defendant . . . if any party so requests." Nothing about the chain of custody or authentication evidence was so inherently prejudicial that presenting this evidence in the presence of the jury posed a risk of prejudice to defendant should the evidence ultimately be excluded.

We note that the prosecutor offered no evidence regarding the downloading and copying of files from the camera to the DVD introduced at trial as a prosecution exhibit, and defendant objected on this ground at trial. But defendant does not challenge this evidentiary deficiency on appeal. He simply challenges the presence of the jury during the presentation of chain of custody evidence, then speculates that the video shown at trial may have been incomplete: "It could be that certain parts of the video were cut or got lost in conversion from the cellular phone format to the format that made it viewable from the Prosecution's laptop. It should be noted that the video could only be viewed from the Prosecution's computer because it was encrypted; insofar a viewer would need a special program to view the video. [Record citation.] The issue is that we don't know how long the actual video was and all of its content therein. Even though [defendant] testified, he himself could not authenticate its complete accuracy because he said there were parts that were not shown or you could not hear." (Underscoring omitted.)

Defendant's argument is based in part on factually erroneous premises. The record demonstrates that the recordings were made with a video camera, not a cellular phone, and nothing in the record indicates any "conversion" was necessary to view or copy the recordings. We have viewed the video file introduced at trial from the DVD admitted as a prosecution exhibit and note that although the video file is encrypted, the decryption software is present on the DVD and readily decrypts the file.

More important, even if, as defendant speculates, the prosecutor did not show portions of the video, portions of the video file "were cut or got lost," or certain matters were inaudible, none of these matters would detract from the authenticity of the portions of the video actually shown by the prosecutor. Authentication essentially requires proof sufficient to sustain a finding that a "writing" is what its proponent claims it is. (Evid.

16

Code, § 1400.)  The testimony of Carneal and of defendant himself satisfied this burden. Matters that were not shown or were inaudible were, in essence, not introduced and would not affect the authenticity of the video that was introduced.  Defendant made the video recording and the prosecutor had provided him with a copy of it at least as of the time of the preliminary hearing.  Indeed, he acknowledged to the trial court during his second trial that he had a copy of it.  If defendant believed the copy of the video provided by the prosecution had been tampered with or that material portions had been "cut" or "lost," he could have informed the trial court and sought to exclude it on that ground, but he failed to do so.  (We note that we have watched the entire video introduced by the prosecution and it appears to be continuously filmed, with no apparent editing and no indication of tampering.)  Alternatively, if defendant believed that portions of the video not shown by the prosecutor were relevant, he could have shown them.

c.    **Admission of recordings**

Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence to the determination of an action.  (Evid. Code, § 210.)  But relevant evidence should be excluded if the trial court, in its discretion, determines that its probative value is substantially outweighed by the probability that its admission will either be unduly time-consuming or create a substantial danger of undue prejudice, confusion of the issues, or mislead the jury.  (Evid. Code, § 352.)  In this context, unduly prejudicial evidence is evidence that evokes an emotional bias against the defendant without regard to its relevance to material issues.  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Although the video recording depicted the aftermath of the collision, it was relevant to show defendant's hostility to the CHP officers, which in turn supported inferences as to defendant's motive and intent when he slammed on his brakes:  He wanted to cause the CHP car to collide with his car because of his animosity toward the pursuing CHP officer.  The possibility that other inferences could be drawn did not deprive the video of its relevancy.  Defendant was free to testify or argue that his

17

belligerence resulted from the stress of the accident, but that did not negate the tendency of the video recording to show that defendant harbored such an intense animosity toward the CHP officers that he may have slammed on his brakes with the intent to force the CHP car into an accident.

Defendant argues the video was unduly prejudicial because it contained profanity and "cast [him] in a bad light." The video does cast defendant in a bad light, but this was because he exhibited such extreme hostility to the officers and firefighters who attempted to assist him. Thus, the video was prejudicial to the defense because it was relevant, not because it would evoke an emotional bias against defendant *without regard to its relevance to material issues*. We cannot conclude that the trial court abused its discretion in finding that the probative value of the video was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.

Even if we were to conclude that the trial court erred by admitting the video, defendant has not shown any likelihood that he would have obtained a more favorable result had the video been excluded. Defendant relies heavily on the hung jury in the first trial, but the jury in that trial was split 10 to 2 in favor of a guilty verdict on the assault with a deadly weapon on a peace officer charge. The testimony of Talaugon and Langford demonstrated that defendant ignored and refused to comply with Talaugon's attempts to pull him over and toyed with Talaugon by repeatedly moving to the right, as if he were going to pull over, then moving back to the left. Talaugon, Martin, and Langford all testified that there was nothing in front of defendant when he slammed on his brakes. Defendant testified that a car cut in front of him as he attempted to pull over, but he did not say that when Talaugon asked him at the scene why he did not pull over. (This was introduced as part of the video, but Talaugon could have been asked about defendant's response if the video had been excluded.) Carneal and Galaz testified regarding defendant's hostile and uncooperative post-accident behavior.

In addition, portions of defendant's testimony were inherently implausible. For example, he testified that he was driving at 85 to 90 miles per hour from his home in

18

Chino to a post office in the City of Industry, notwithstanding a known stalling or acceleration problem with his car that caused him so much concern that he drove alone in the carpool lane and feared he would not make it to the next exit. He also testified that when the car cut in front of him he braked hard instead of moving left because he did not want the CHP officer to think that he was not pulling over, he drove his car to the center divider after the accident, a firefighter grabbed him by the throat, three firefighters "threw" him from the driver's seat onto the gurney and immediately handcuffed him, and, although he was complaining of neck and back pain, the firefighters removed the neck brace they had put on him while he was still in his car and no one put it back on him.

Accordingly, we conclude there is no reasonable probability defendant would have obtained a more favorable verdict if the video had been excluded.

## 2. Denial of motion for new trial

Defendant filed a motion for a new trial that argued that CHP "Officer Jones" committed perjury by testifying that a Dr. Dwalt told him there was nothing wrong with defendant and that defendant did not need follow-up care. Attached as an exhibit to the motion was an incomplete copy of an "Emergency Dept [*sic*] Discharge" report that did not reflect the patient's name but included the name of Dr. Richard W. "Dorosh." The new trial motion also argued—apparently with reference to admission of the video recordings—that the trial court "would not even allow a 402 hearing." It also cryptically alleged "that the chain was affected by Madden's misconduct is well beyond speculation."

The hearing on defendant's motion for a new trial was set for January 25, 2012, but on that date the prosecutor informed the court she had just received the motion the prior day. She asked for and received "additional time to file" a response. When the motion came on for hearing on February 29, 2012, the prosecutor had not filed a written response. Defendant asked the court to preclude the prosecutor from opposing the motion for lack of notice to defendant "as to any objection they have as to the factual

19

summary or the law . . . cited." The court declined to do so, stating that defense counsel represented defendant at trial and was presumptively "on notice as to what the evidence was that was presented in the trial."

The prosecutor explained that she did not "believe there's anything that requires the People to file any written opposition," and also explained she had been out of the office. She then argued that Carneal did not commit perjury; he testified that defendant was cleared for booking and there was nothing wrong with defendant, but there was no showing "the doctor gave him any additional paperwork or anything showing that there was anything wrong with him. [¶] And if at the time the defense felt that the officer had committed any sort of perjury or was not testifying truthfully, of course they could have then brought in the doctor to testify . . . ." The prosecutor then argued that the parties and court had discussed the chain of custody issue, she had given defendant paperwork showing that the video was booked, defendant had the opportunity to further examine Carneal about the chain of custody while he testified, and any defects in the proof of chain of custody would go to the weight, not admissibility of the video.

The court asked the prosecutor who "Officer Jones" was, and she explained, "That was Officer Carneal. There was no Officer Jones who testified." Defendant responded, "This is one of the issues that I'm raising, your Honor. If she disagreed with the facts, then she would have had to have filed an opposition saying that's not accurate. [¶] She cannot have it both ways. To say today that it's not this person, when she had the opportunity to raise that in an opposition."

On questioning from the court, defendant clarified that his reference to Dr. Dwatt was a typographical error and was intended to refer to Dr. Dorosh. He then argued that Dr. Dorosh's report went "into great detail to show and to demonstrate that this person wasn't fine and did need care. He just said whatever problems he had, he still was okay for booking."

The court asked defendant who Madden was. Defendant responded, "I believe, if I'm not incorrect, Madden was one of the officers that was mentioned during whatever

20

short discussion we had regarding the chain of custody of the video." The court then asked defendant what Madden's alleged misconduct was. Defendant replied, "You would not allow me to thoroughly examine the person or persons involved with the chain of custody. You cut me off at the pass."

The court denied defendant's motion, explaining, "We discussed at great lengths the chain of custody and the arguments presented at trial. And all of those arguments and all of the factors that were presented are in the record and will be incorporated at this point. [¶] You make reference to a chain of reasoning. In our particular case, there's almost no reasoning required. The officer seizes the tape that they had observed the defendant making of them, they identified themselves in the tape, identified the defendant in the tape, and identified the defendant's voice in the tape. [¶] Defendant, in essence, confirmed in his testimony everything that was on the tape. He explained it. But he confirmed everything that was on the tape. [¶] There's no indication whatsoever that that tape in any way, shape, or form has been edited, changed, deleted. The defendant would certainly have been in a position to be able to relate that when he was on the stand testifying. [¶] So your motion for mistrial [*sic*] and new trial on those grounds will be denied for the reasons cited during the trial. [¶] The Court does not believe that any error has been committed. . . . [O]n those TWO points, I don't think there's an error."

Defendant contends that the trial court erred by summarily denying the motion for a new trial without explanation, allowing the prosecutor "to make an oral opposition without hav[ing] filed a written opposition," and failing "to independently review the evidence."

A trial court may grant a motion for a new trial upon the basis of one of the grounds listed in section 1181, ineffective assistance of trial counsel, or where it determines that the defendant has been denied a fair trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582–583; *People v. Sherrod* (1997) 59 Cal.App.4th 1168, 1175.) But a "trial court may grant a motion for new trial only if the defendant demonstrates reversible error." (*Guerra*, *supra*, 37 Cal.4th at p. 1159.) The determination of a motion for a new

21

trial rests so completely within the trial court's discretion that its ruling will not be disturbed on appeal absent a manifest and unmistakable abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.)

As demonstrated by our recitation of the trial court's ruling, the court did not summarily deny defendant's new trial motion without explanation. It explained its reason with respect to the chain of custody claim. Although it did not do so with respect to the purported perjury of Jones or Carneal, its discussion of the contentions in defendant's motion demonstrates that it considered them. The court was not required to explain why it rejected defendant's contention.

Defendant cites no authority for his contention that the prosecutor should not have been allowed to argue against his motion for a new trial because she had not filed written opposition. Because a motion for a new trial need not be in writing (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251, fn. 2), there appears to be no reason to require written opposition. If defendant felt he needed additional time to prepare a response to the prosecutor's argument at the hearing, he could have requested it. The prosecutor's oral opposition was brief and straightforward, and based upon the trial record. She did not cite any authorities or matters outside the trial record, and defendant has not even suggested how permitting the prosecutor to make her brief argument violated due process, rendered his trial unfair, or even impaired his ability to respond.

Defendant's contention that the trial court failed "to independently review the evidence" is misplaced because defendant did not assert in his new trial motion that the verdict was contrary to law or evidence. On appeal defendant seemingly argues that the verdict was contrary to the evidence, but this was not one of the two grounds set forth in his motion. A trial court cannot be held to have abused its discretion regarding an issue that it was never asked to consider. (*Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 407.)

With respect to the merits of the two grounds set forth in defendant's motion, we cannot conclude the trial court abused its discretion by denying the motion. Defendant

22

relied on an obviously incomplete and unauthenticated document referring to an unidentified patient that was not in evidence and apparently was never mentioned at trial to argue that a nonexistent witness, Officer Jones, committed perjury. Even if the document were considered and defendant was referring to the testimony of Carneal, not Jones, defendant failed to demonstrate perjury. Carneal testified that the emergency room physician did not give him any instructions regarding further treatment for defendant, but told him, in essence, that defendant was not injured, there was nothing wrong with defendant, and he could book defendant. The contents of the incomplete and unauthenticated document do not indicate that the physician author or anyone else told Carneal that defendant was injured, something was wrong with defendant, defendant needed follow-up care, or defendant could not or should not be booked. Indeed, the document stated, "Although [*sic*] the patient probably will need to be on medication for his diabetes. His sugar is not so high that he requires hospitalization. He can be discharged, actually he is medically cleared for booking, but I suggest checking his sugars and he may need to be on some medicine. His BUN and creatinine are sufficiently low that he actually will be started on metformin here 500 mg a day." The document listed "DIAGNOSES" as "1. Status post motor vehicle accident, acute trauma exam[.] [¶] 2. General myalgia secondary to #1. [¶] 3. Anxiety secondary to his arrest. [¶] 4. Diabetes mellitus, not previously treated." It listed the following "PLAN": "1. Glucophage 500 mg tabs 20 pills, one p.o. daily. [¶] 2. Tylenol, motrin as needed. [¶] 3. The patient is felt medically clear for booking with the above medications. I suggest that he have his sugars checked regularly and to see a physician within the week for followup." If, based upon this document or defendant's own recollection, defendant believed that Carneal's testimony was false, he could have called the emergency room physician as a witness to testify regarding what he told Carneal. The document does not establish that Carneal lied about what the physician told him.

Nor did the trial court err by denying the motion with respect to defendant's claim that it did not allow an Evidence Code section 402 hearing and "the chain was affected

by Madden's misconduct." We have found no reference to anyone named Madden in the trial record. Defendant failed to even explain his theory of, let alone demonstrate, any misconduct by Madden or anyone else. As previously noted, the court was not required to require proof of the chain of custody outside of the presence of the jury, which seems to be what defendant meant by not allowing an Evidence Code section 402 hearing.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.

24